FORMER EMPLOYEES OF GENERAL ELECTRIC CORP., PLAINTIFFS *v.*
U.S. DEPARTMENT OF LABOR, DEFENDANT

Court No. 87-08-00823

(Decided September 6, 1990)

*Sidney N. Weiss*, for plaintiffs.

*Stuart M. Gerson*, Assistant Attorney General, *David M. Cohen*, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Velta A. Melnbrencis*), *Gary Bernstecker*, United States Department of Labor, Of Counsel, for defendant.

### OPINION AND ORDER

CARMAN, *Judge*: Plaintiffs, former employees of General Electric Corporation (G.E.), move this Court for judgment upon the agency record pursuant to USCIT Rule 56.1. Plaintiffs contend that there is not substantial evidence on the record to support the determination of the United States Department of Labor (Labor) denying plaintiffs' certification for eligibility for trade adjustment assistance. This Court has jurisdiction pursuant to 19 U.S.C. § 2395 (1988) and 28 U.S.C. § 1581(d)(1) (1988). For the reasons that follow, this Court holds that Labor's determination is not supported by substantial evidence on the record and that good cause exists to remand this action to Labor to conduct a new investigation and determination.

### BACKGROUND

Plaintiffs, seventy-one former G.E. employees, were workers at G.E.'s Hampton Roads production facility in Portsmouth, Virginia. According to newspaper articles appended to plaintiffs' petitions, black-and-white and color television receivers (television sets) had been produced at the plant since 1966. Administrative Record (A.R.) at 27–28. In 1981 G.E. apparently stopped producing black-and-white television sets at the Portsmouth plant and began importing them from a Korean manufacturer. In July of 1985, G.E. also apparently ceased producing 10- and 13-inch color television sets at the Portsmouth plant and began importing them from the Far East. A.R. 30.

The newspaper articles submitted by plaintiffs also disclose that in October of 1985, G.E. announced that Matsushita Electric Industrial Company, Ltd. of Japan had agreed to manufacture all large screen (19-inch and above) color televisions for G.E. and that the agreement would result in the termination of all work relating to color television production and warehousing at the Portsmouth facility. A.R. 27–34. At that time, G.E. anticipated that the manufacture of 19- and 25-inch color television sets at the Portsmouth plant would end between May and August of 1986, and that warehouse operations at the Portsmouth plant would conclude in late 1986. G.E. actually terminated all production of color television sets at the Portsmouth plant on October 31, 1986.

A.R. 67. The record does not appear to indicate when warehouse and phase-out operations related to television production ceased.

At the time G.E. slated termination of production at the Portsmouth plant, G.E. also stated that it intended for the headquarters of its Consumer Electronics Business operations, which employed approximately 400 employees, to remain at the Portsmouth facility. This plan apparently changed upon G.E.'s purchase of RCA Corp. in 1986. As a result of this acquisition, many of the employees at the Portsmouth facility were laid-off and a substantial number of employees were transferred to a consolidated G.E./RCA Consumer Electronics headquarters in Indianapolis, Indiana.

On the basis of the 1985 decision by G.E. to close the Portsmouth plant and produce color televisions in Japan, all workers at the Portsmouth plant who had been laid off were certified by Labor as eligible for trade adjustment assistance benefits. 50 Fed. Reg. 15,990–91 (Apr. 23, 1985). This certification expired by statute on April 9, 1987. *See* 19 U.S.C. § 2291(a)(1)(B) (1982).

On March 17, 1987, plaintiffs petitioned Labor for certification for trade adjustment assistance pursuant to 19 U.S.C. § 2272 (1982 & Supp. V 1987). In their petitions plaintiffs contended that they were employed in the production of television sets for G.E.'s Consumer Electronic Business operations located at the Portsmouth plant, and asserted they were laid off (or were slated to be laid off) from their jobs due to G.E.'s decision in 1985 to discontinue production of television sets at the Portsmouth plant. Plaintiffs contended that G.E. terminated production at the Portsmouth facility because of import competition.

Labor verified the petitions and conducted an investigation, which, in its entirety, appears to have consisted of a telephone conversation with a G.E. public relations employee and G.E.'s answers to a short questionnaire. Confidential Administrative Record (Conf. R.) at 68–70; A.R. 64–65. On this basis Labor determined that:

> [The Portsmouth] facility had manufactured color television receivers prior to October, 1986. All of the workers at the subject plant were certified as eligible to apply for trade adjustment assistance on April 9, 1985 (TA–W–15,701). That certification was based on a transfer of production to a foreign manufacturer and on major customers who increased purchases of imported color televisions during the period that the subject plant was decreasing production of these televisions. The certification expired on April 9, 1987.
>
> All production at the subject plant ceased permanently on October 31, 1986. The remaining employees have been involved in administrative tasks in support of all General Electric's [sic] video products. The corporate merger of General Electric and RCA has subsequently resulted in the consolidation of administrative and headquarters functions into an existing RCA facility in Indianapolis, Indiana. * * *

A.R. 67.

In its Negative Determination Regarding Eligibility To Apply for Worker Adjustment Assistance (Negative Determination), Labor determined that increases in imports of articles like or directly competitive with articles produced by G.E. did not contribute importantly to plaintiffs' layoffs and denied plaintiffs certification. A.R. 72–73; 52 Fed. Reg. 23,614 (June 23, 1987) (Notice of Negative Determination). In the Negative Determination, Labor characterized plaintiffs as "workers [who] perform administrative functions in support of all of the company's video products." A.R. 73. Labor concluded by stating the basis for its determination as follows:

> All layoffs at the subject plant which occurred before April 9, 1987 are covered by an existing certification (TA–W–15,701). Layoffs which occurred after that date are the result of a corporate restructuring of administrative functions which entails transferring jobs to another domestic facility.

A.R. 73; 52 Fed. Reg. at 23,614. Plaintiffs requests for reconsideration were denied and this action ensued. *See, e.g.*, A.R. at 158–59.

## CONTENTIONS OF THE PARTIES

Plaintiffs argue that there is not substantial evidence on the record to support Labor's determination that imports did not contribute importantly to their employment termination. Plaintiffs' position, and the basis of their claims for certification, is that after production ceased in October of 1986 they were kept on as "temporarily assigned employees" to assist in the transfer of production and other "phase-out" activities associated with the production termination, including but not limited to, the transfer of certain information concerning manufacturing technology and techniques. Plaintiffs also contend that they were assured that worker adjustment benefits would be available to them after their temporary "phase-out" assignments had been completed.

Plaintiffs assert that their job loss was directly attributable to G.E.'s 1985 decision to source merchandise in Japan and to cease production of televisions at the Portsmouth plant. Plaintiffs expressed dismay at Labor's determination that they were not eligible for certification for trade adjustment assistance benefits because their employment was terminated after the expiration of the 1985 certification, on April 9, 1987. Plaintiffs claim there is no meaningful distinction between production workers terminated prior to April 8, 1987, who were certified, and workers laid off after that date, who were not certified. Plaintiffs further contend that there is no support in the record for the assertion that plaintiffs were engaged in "administrative tasks" as opposed to production or related services. Additionally, plaintiffs claim that Labor did not conduct a minimally adequate investigation. Plaintiffs argue that Labor should have, at a minimum, verified or otherwise corroborated G.E.'s questionnaire responses. Further, plaintiffs contend the case should be remanded for good cause shown.

Labor contends that the negative determination is supported by substantial evidence on the record. Labor's central argument is that its in-

vestigation was adequate because the fact that production ceased at the Portsmouth plant in October of 1986 made it impossible for any of the plaintiffs to qualify under the statute as *producers* of articles. That is, since no televisions sets were being produced at the Portsmouth facility after October 1986, no workers could be engaged in producing them within the meaning of the statute. At oral argument, Labor also relied on the confidential questionnaire responses of the G.E. official as support in the record that plaintiffs were laid off from their jobs due to a management decision to consolidate the headquarters of their Consumer Electronics Business with RCA's in Indianapolis. Conf. R. at 68–70.

## DISCUSSION

A negative determination by the Secretary of Labor denying certification of eligibility for trade adjustment assistance will be upheld if it is supported by substantial evidence on the record and is otherwise in accordance with law. 19 U.S.C. § 2395(c) (1982); *see Woodrum v. Donovan,* 5 CIT 191, 193, 564 F. Supp. 826, 828 (1983), *aff'd, sub nom. Woodrum v. United States,* 2 Fed. Cir. (T) 82, 737 F.2d 1575 (1984). The findings of fact by the Secretary are conclusive if supported by substantial evidence. 19 U.S.C. § 2395(b). Substantial evidence has been held to be more than a "mere scintilla," but sufficient evidence to reasonably support a conclusion. *Ceramica Regiomontana, S.A. v. United States,* 10 CIT 399, 405, 636 F. Supp. 961, 966 (1986) (and cases cited therein), *aff'd,* 5 Fed. Cir. (T) 77, 810 F.2d 1137 (1987). Additionally, "the rulings made on the basis of those findings [must] be in accordance with the statute and not be arbitrary and capricious, and for this purpose the law requires a showing of reasoned analysis." *International Union v. Marshall,* 584 F.2d 390, 396 n.26 (D.C. Cir. 1978).

This Court has also observed.that "because of the *ex parte* nature of the certification process, and the remedial purpose of the trade adjustment assistance program, the Secretary is obliged to conduct his investigation with the utmost regard for the interests of the petitioning workers." *Stidham v. Department of Labor,* 11 CIT 548, 551, 669 F. Supp. 432, 435 (1987) (citing *Abbott v. Donovan,* 7 CIT 323, 327–28, 588 F. Supp. 1438, 1442 (1984)). Furthermore,

> A reviewing court may remand a case and order the secretary to further investigate if "good cause [is] shown." 19 U.S.C. § 2395(b). "Good cause" exists if the Secretary's chosen methodology is "so marred that [his] finding is arbitrary or of such a nature that it could not be based on 'substantial evidence.'" *United Glass & Ceramic Workers of North America, AFL-CIO v. Marshall,* 584 F.2d 398, 405 (D.C. Cir. 1978); *Cherlin v. Donovan,* 7 CIT 158, 162, 585 F. Supp. 644, 647 (1984).

*Former Employees of Linden Apparel Corp. v. United States,* 13 CIT 467, 715 F. Supp. 378, 381 (1989).

Under 19 U.S.C. § 2272 a group of workers will be certified as eligible for trade adjustment assistance benefits if Labor determines:

> (1) that a significant number or proportion of the workers in such workers' firm or an appropriate subdivision of the firm have become totally or partially separated, or are threatened to become totally or partially separated,
> (2) that sales or production, or both, of such firm or subdivision have decreased absolutely, and
> (3) that increases of imports of articles like or directly competitive with articles produced by such workers' firm or an appropriate subdivision thereof contributed importantly to such total or partial separation, or threat thereof, and to such decline in sales or production.

> For purposes of paragraph (3), the term 'contributed importantly' means a cause which is important, but not necessarily more important than any other cause.

*Id.*[1] Labor concluded that criterion (3) above had not been satisfied on the basis that plaintiffs were administrative workers not engaged in the production of articles.

Based on an examination of the record, particularly the confidential business questionnaire responses of G.E., Conf. R. at 69–70, the Court concludes that Labor's negative determination was not based upon substantial evidence and that the investigation was so inadequate that good cause exists to remand the matter to Labor for a new determination.

In its questionnaire responses G.E. divided the former Portsmouth plant employees into two groups: workers laid off prior to March 31, 1987, whose jobs were purportedly terminated as a result of imports, and; workers laid off on or after August 5, 1987, whose terminations were said to result from corporate consolidations. G.E. noted that its decision to terminate production of color television sets at the Portsmouth plant resulted from a corporate decision to transfer production abroad, but claimed that the final layoffs related to that decision were on March 31, 1987. Conf. R. 70. However, the G.E. statements provided no further explanation of or factual support for these bald assertions, such as which employees were affected, their employment responsibilities and whether any of the workers were assigned to temporary "phase-out" positions.

On the basis of G.E.'s conclusory assertions alone, it cannot be ascertained whether plaintiffs were properly classified by G.E. as administrative workers who were laid off as a result of corporate consolidation or because of the effects of increased imports. The questionnaire responses do not articulate the basis upon which G.E. determined which workers were "administrative" or how the March 31, 1987 cutoff date was determined. Nor does the information in the record explain which workers

---

[1] Congress amended and renumbered section 2272 of title 19 in 1988. *See* 19 U.S.C. § 2272 (1988). The changes have no bearing on this case.

were affected by and what factors were involved in, G.E.'s "corporate restructuring" decision or how G.E. determined that the job terminations resulted entirely from that decision.

While it is true that the agency has considerable discretion in conducting its investigations, and this Court will defer to its choice of reasonable methodologies, Labor must base its determination upon sufficient evidence for a reasonable mind to concur in the result. Here, Labor did not conduct a sufficiently thorough and searching investigation to fully assess plaintiffs' claims, especially when viewed in light of the remedial purpose of the statute.

On the facts in the record, neither Labor nor this Court could conclude that foreign imports did not contribute importantly to the plaintiffs' layoffs. Indeed, it is conceded by the parties that G.E.'s decision to source merchandise in Japan directly contributed to a substantial number of layoffs at the Portsmouth plant. G.E.'s unsupported assertions that the remaining workers were administrative workers in G.E.'s video unit, not only directly contradicts the workers' petitions, it simply cannot be supported on the basis of G.E.'s conclusory assertions on this record. Whether plaintiffs were administrative workers laid off due to corporate restructuring is a decision that Labor must make on the basis of facts in the record that explicate the effects of G.E.'s decision to produce television sets in Japan.

This Court cannot give credence to the Labor's argument that it would be impossible for any of plaintiffs to meet the statutory requirement that they be engaged in the production of an article, since all production ceased at the plant in October of 1986. First, nowhere does Labor's Negative Determination or the record state that this interpretation of the statute was the basis of its negative decision. Second, the statute does not require that the workers be physically engaged in production at the time they are laid off in order to be certified; it requires a showing that "increases of imports * * * contributed importantly" to their job loss. 19 U.S.C. § 2272(3). Clearly, production workers that are kept on after termination of production, to complete warehousing and other phase-out activities related to the production of articles, can be found to have been laid off due to increased imports. On the other hand, it is equally obvious that post-production phase-out activities cannot last indefinitely. Labor's inadequate investigation failed to uncover sufficient facts to provide reasonable answers to these questions.

Finally, the Court notes that it appears that workers at the Portsmouth plant who were laid off after production had ceased on October 31, 1986, but before the 1985 certification expired on April 9, 1987, would have been eligible for certification for trade adjustment benefits, even though no articles were actually being produced at the plant. Indeed, according to counsel at oral argument, it appears that some workers who were laid off during this post-production time period were in fact certified as eligible for adjustment assistance under the 1985 certification. In conclusion the Court is unpersuaded by Labor's argument

that workers who were terminated from their employment after production ceased at the Portsmouth plant were *ipso facto* incapable of meeting the statutory requirements of eligibility for trade adjustment assistance.

### CONCLUSION

The Court concludes there is not substantial evidence on the record to support Labor's determination denying eligibility for trade adjustment assistance to plaintiffs and that there is good cause to remand this matter to Labor for a new investigation and redetermination in accordance with this opinion. Labor is directed to conduct a thorough investigation to determine whether G.E.'s decision to source merchandise in Japan "contributed importantly" to plaintiffs' job loss within the meaning of 19 U.S.C. § 2272, taking into account petitioners' claims that they were production workers engaged in the "phase-out" of production activities at the Portsmouth facility.