**INTERNATIONAL UNION, UNITED AU-TOMOBILE, AEROSPACE AND AGRI-CULTURAL IMPLEMENT WORKERS OF AMERICA, UAW LOCAL 1283 and Employees and Former Employees of Johnson Controls Battery Group, Inc., Plaintiffs,**

v.

**Robert REICH, Secretary of Labor, Defendant.**

**Slip. Op. 98–103.**

**Court No. 96–04–01141.**

United States Court of International Trade.

July 17, 1998.

Jordan Rossen, General Counsel International Union, UAW; Charles M. Gayney, Associate General Counsel; Leonard Page, Associate General Counsel; Stephen A. Yokich, Associate General Counsel, for Plaintiffs.

Frank W. Hunger, Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, (Randi–Sue Rimerman); Michele W. Curran, of Counsel, Office of the Solicitor, United States Department of Labor, Washington, DC, for Defendant.

## OPINION

WALLACH, Judge.

## I

## INTRODUCTION

This case is before this Court on Plaintiffs' Motion for Judgment on the Agency Record pursuant to USCIT R. 56.1. International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW Local 1283, and Employees and Former Employees of Johnson Controls Battery Group, Inc. ("Plaintiffs") challenge the Department of Labor's ("DOL") determination that the former employees of the Johnson Controls Battery Group, Inc. ("Johnson Controls") plant in Louisville, Kentucky ("Louisville plant") are not eligible for certification because increased imports did not contribute importantly to the workers' separation from employment, as required by Section 222 of the Trade Act of 1974, *amended by* the Omnibus Trade and Competitiveness Act of 1988 (P.L. 100–418), 19 U.S.C. § 2272(a)(3) ("Trade Act"). *See Johnson Controls Battery Group, Inc. Louisville, Kentucky; Notice of Negative Determination of Reconsideration On Remand,* 62 Fed.Reg. 31,626

(Dep't Labor 1997) ("*Notice of Negative Determination of Reconsideration On Remand*"). DOL's denial of certification is supported by substantial evidence and is in accordance with the trade adjustment assistance provisions of the Trade Act. Therefore, DOL's final determination is affirmed.

## II

## BACKGROUND

■ The purpose of the trade adjustment assistance program is "to offer unemployment compensation, training, job search and relocation allowances, and other employment services to workers who lose their jobs because of import competition." *Former Employees of Parallel Petroleum Corp. v. United States Secretary of Labor*, 14 CIT 114, 118, 731 F.Supp. 524, 527 (1990).

In order to certify a group of workers as eligible to apply for trade adjustment assistance under Section 222 of the Trade Act, the Secretary of Labor ("Secretary") must determine:

(1) that a significant number or proportion of the workers in such workers' firm or an appropriate subdivision of the firm have become totally or partially separated, or are threatened to become totally or partially separated,

(2) that sales or production, or both, of such firm or subdivision have decreased absolutely, and

(3) that increases of imports of articles like or directly competitive with articles produced by such workers' firm or an appropriate subdivision thereof contributed importantly to such total or partial separation, or threat thereof, and to such decline in sales or production.

19 U.S.C. § 2272(a) (1994).

In order to receive trade adjustment assistance benefits, Plaintiffs must satisfy all three requirements of Section 222 of the Trade Act. *See, e.g., Former Employees of Bass Enterprises Production Co. v. United States*, 13 CIT 68, 70, 706 F.Supp. 897, 900

(1989) ("[F]ailure to satisfy any one of the three criteria for certification of workers for assistance will result in denial of adjustment assistance."); *Abbott v. Donovan*, 8 CIT 237, 239, 596 F.Supp. 472, 474 (1984) ("If any of these three statutory conditions does not exist, the Secretary must deny certification.").

On August 22, 1995, pursuant to 19 U.S.C. § 2271, a petition for certification of eligibility for trade adjustment assistance was filed on behalf of the former employees of the Louisville plant. Petition for Trade Adjustment Assistance filed by Puckett on Aug. 22, 1995, Administrative Record ("AR") 2 ("Petition for Trade Adjustment Assistance"). On October 13, 1995, DOL denied certification because increased imports did not contribute importantly to the separation of Louisville employees. *See* Johnson Controls Battery Group, Inc. Louisville, Kentucky; Negative Determination Regarding Eligibility To Apply for Worker Adjustment Assistance, AR 15 ("Negative Determination"); *Notice of Determinations Regarding Eligibility To Apply for Worker Adjustment Assistance and NAFTA Transitional Adjustment Assistance*, 60 Fed.Reg. 55,063 (Dep't Labor 1995). DOL's investigation revealed that production had been transferred domestically and the firm's sales, production and employment had not declined prior to the implementation of the transfer. Negative Determination, AR 16.

On November 13, 1995, the employees petitioned for reconsideration of the negative determination. Letter from Puckett to Trunzo dated Nov. 13, 1995, AR 18–19. The application noted that workers from three other Johnson Controls' production facilities that had closed in the preceding 18 months had been certified after an initial denial. *Id.* It alleged that production from those facilities has been shipped to a new facility in Torreon, Mexico which produced new and aftermarket batteries. *Id.* at 18. It also asserted that batteries from the Louisville plant were being shipped to Mexico and returned to the United States in new cars. *Id.*[1]

---

1. The petitioner submitted the following information with the application for reconsideration: a letter from Rep. Bernard Sanders of Vermont regarding the transfer of production from John-

son Controls' plant in Vermont to Mexico, minutes of meetings between UAW and Johnson Controls representatives regarding production at Johnson Controls' plant in Mexico, a request for

On November 30, 1995, DOL granted the request for reconsideration because "[t]he petitioner [had presented] evidence that the subject firm shifted production to a foreign owned facility." *Johnson Controls Battery Group, Inc. Louisville, Kentucky; Notice of Affirmative Determination Regarding Application for Reconsideration,* 60 Fed.Reg. 63,733 (Dep't Labor 1995).

On February 6, 1996, the Secretary affirmed the denial of certification. *Johnson Controls Battery Group, Inc. Louisville, KY; Notice of Negative Determination on Reconsideration,* 61 Fed.Reg. 6658, 6659 (Dep't Labor 1996). DOL concluded it was irrelevant whether batteries from Mexico were entering the United States in new automobiles, as Plaintiffs alleged, because DOL was statutorily required to examine whether imports of articles like or directly competitive with the automobile batteries produced at the Louisville plant contributed importantly to Plaintiffs' separation. *See id.* at 6658.

In accord with its general practice, DOL surveyed the Louisville plant's customers to determine whether the "contributed importantly" test was satisfied. *See id.* DOL found that the Louisville plant's customers did not increase their purchases of imports while decreasing their purchases from the Louisville plant. *Id.* at 6658–59. DOL also found there was no evidence that the Louisville plant imported automobile batteries. *Id.* at 6659. In addition, it determined that the value of United States imports of automobile batteries declined from 1993 to 1994 and from October 1993 to September 1994 to the same twelve-month period in 1994–95. *Id.*

As for the workers at the other three plants that were certified, DOL stated that "[e]ach worker group petition is determined for certification on its own merits. The Trade Act was not intended to provide TAA benefits to everyone who is in some way affected by foreign competition but only to those who experienced a decline in sales or

Louisville personnel to assist the company in training production and maintenance personnel in Mexico, information on Johnson Controls' production and sales in Mexico and bills of lading suggesting Johnson Controls was shipping

production and employment and an increase in imports of like or directly competitive products which 'contributed importantly' to declines in sales or production and employment." *Id.*

On April 24, 1996, Plaintiffs challenged DOL's negative determination in this Court. On December 12, 1996, DOL requested a voluntary remand to more fully investigate whether the workers met the eligibility criteria. Defendant's Memorandum In Opposition at 7–8. On February 4, 1997, this Court remanded this action to DOL to conduct an additional investigation of Plaintiffs' application for certification and ordered Plaintiffs to submit to DOL any additional information warranting consideration.

On remand, DOL submitted a supplemental questionnaire to Johnson Controls. Letter from Poole to Bagley dated Apr. 29, 1997 with attachment, Supplemental Confidential Administrative Record ("SCAR") 2–3. DOL asked whether Johnson Controls had shifted any battery production from Louisville to Mexico, and whether it had imported automobile batteries from Mexico or any other foreign source like or directly competitive with batteries made at the Louisville plant. *Id.* at 3. DOL also requested information on the percentage of sales from the Louisville plant to each of its customers from January to September 1995. *Id.* Johnson Controls responded that no production had been shifted from the Louisville plant to Mexico, noted that production of automotive batteries sold to Gonher de Mexico from Louisville were transferred to its St. Joseph, Missouri facility, provided the percentage of battery sales to each plant customer, and explained why imported batteries from Johnson Controls' Mexican facility were different from batteries produced at the Louisville plant. Johnson Controls Completed Supplemental Questionnaire dated May 5, 1997, SCAR 5 ("Johnson Controls Completed Supplemental Questionnaire").

batteries from Louisville to Mexico. Attachments to Request for Reconsideration dated Nov. 13, 1995, Confidential Version of the Original Administrative Record ("CAR") 23–104.

On May 16, 1997, DOL affirmed its original denial of certification. *Notice of Negative Determination of Reconsideration On Remand,* 62 Fed.Reg. at 31,626. DOL explained that it granted certification petitions for former workers at Johnson Controls' Garland, Texas; Bennington, Vermont; and Owosso, Michigan plants because their customers reported increased imports of aftermarket batteries, the product those plants produced, during the relevant time period. *Id.* at 31626. As a result, "it was determined that imports 'contributed importantly' to worker separations." *Id.* By contrast, the Louisville plant customers were new car producers purchasing original equipment, automotive batteries, rather than aftermarket batteries. *Id.* Finally, DOL found that the remand investigation confirmed that battery production at the Louisville plant was shifted to another Johnson Controls facility in the United States. *Id.*

On August 7, 1997, Plaintiffs submitted a Reply In Opposition To Defendant's Negative Determination on Remand ("Plaintiffs' Reply"). Plaintiffs challenge DOL's determination that the former employees of the Louisville plant are not eligible for certification because increased imports did not contribute importantly to the workers' separation from employment.

Plaintiffs assert that DOL's determination that the workers are ineligible for certification is not supported by substantial evidence on the record and is not otherwise in accordance with law. Specifically, Plaintiffs contend that DOL failed to consider the closing of the Louisville plant in relation to, and as part of, the closing of Johnson Controls battery plants in Garland, Bennington, and Owosso in 1994 and 1995. *See* Plaintiffs' Brief at 2 and 6. In addition, Plaintiffs allege that DOL failed to adequately investigate their claims, improperly grouped distinct battery categories in its import analysis and placed unwarranted reliance on the responses of Johnson Controls. *Id.* Finally, Plaintiffs claim that "[w]hile [DOL's] decision to take a 'fresh look' at the case was laudable, its most recent Negative Determination wholly fails to answer the legal and factual issues raised by plaintiffs." Plaintiffs' Reply

at 1. Plaintiffs move this Court to remand this case to the Secretary and reopen the administrative record for a full and fair investigation.

## III

## JURISDICTION AND STANDARD OF REVIEW

Pursuant to 19 U.S.C. § 2395(c) (1994) and 28 U.S.C. § 1581(d)(1) (1994), this Court has exclusive jurisdiction to review DOL's final determination regarding the eligibility of workers for adjustment assistance under section 223 of the Trade Act, 19 U.S.C. § 2273 (1994).

The Court decides an adjustment assistance case based on the administrative record before it. 28 U.S.C. § 2640(c) (1994). As set forth in 19 U.S.C. § 2395(b) (1994):

> [t]he findings of fact by the Secretary of Labor ... if supported by substantial evidence, shall be conclusive; but the court, for good cause shown, may remand the case to such Secretary to take further evidence, and such Secretary may thereupon make new or modified findings of fact and may modify his previous action, and shall certify to the court the record of the further proceedings. Such new or modified findings of fact shall likewise be conclusive if supported by substantial evidence.

*Id.; see Former Employees of Stanley Smith, Inc. v. United States Secretary of Labor,* 967 F.Supp. 512, 515 (CIT 1996). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938). The Court will substantially defer to the agency's " 'chosen technique, only remanding a case if that technique is so marred that the Secretary's finding is arbitrary or of such nature that it could not be based on "substantial evidence." ' " *Stidham v. United States Dep't of Labor,* 11 CIT 548, 551, 669 F.Supp. 432, 435 (1987) (quoting *Retail Clerks Int'l Union v. Donovan,* 10 CIT 308, 312 (1986)) (quoting *United Glass and Ceramic Workers of North*

*America v. Marshall*, 584 F.2d 398, 405 (D.C.Cir.1978)).

## IV

## DISCUSSION

### A

### DOL Used The "Appropriate Subdivision" To Determine Eligibility For Trade Adjustment Assistance

■ Plaintiffs claim that DOL arbitrarily rejected Plaintiffs' definition of the "appropriate subdivision" of the firm used in evaluating whether the former employees of the Louisville plant were eligible for trade adjustment assistance.[2] *See* Plaintiffs' Brief at 5–8. Plaintiffs contend DOL should have considered the closing of the Louisville plant "in relation to, and as part of, a series of battery plants that Johnson Controls closed in 1994 and 1995." Plaintiffs' Brief at 2.

Plaintiffs claim that "[b]oth the identity of the product and its transferability[3] among different facilities support [their] argument that the appropriate subdivision for the Louisville plant should include the Garland, Bennington and Owosso plants." Plaintiffs' Brief at 8. Plaintiffs contend that Louisville was "merely the last plant in a downsizing 'daisy chain.'" *Id.*

Under the Trade Act, DOL may certify a group of workers as eligible for trade adjustment assistance benefits upon finding, *inter alia*, that the workers in a "firm or an appropriate subdivision of the firm" have been adversely affected by "increases of imports of articles like or directly competitive with articles produced by such workers' firm or an appropriate subdivision thereof...." Trade Act, § 222(a)(3), 19 U.S.C. § 2272(a)(3) (1994).

DOL regulations define "appropriate subdivision" as

an establishment in a multi-establishment firm which produces the domestic articles in question or a distinct part or section of an establishment (whether or not the firm has more than one establishment) where the articles are produced. The term *appropriate subdivision* includes auxiliary facilities operated in conjunction with (whether or not physically separate from) production facilities.

29 C.F.R. § 90.2 (1995).

■ "It is the Secretary's function to choose a subdivision that best effectuates the purposes of the Trade Act in light of the circumstances of the individual case." *Int'l Union v. Marshall*, 584 F.2d 390, 397 (D.C.Cir.1978). However, "when a petitioner under a government benefits program puts forward an interpretation of a legislative provision that is arguably consonant with the statutory language, he is at least entitled to a reasoned statement why the administrator will not adopt that interpretation." *Id.* at 396. "The mechanical adoption of the plant as the appropriate subdivision without reasoned analysis is improper." *Lloyd v. United States Dep't of Labor*, 637 F.2d 1267, 1275 (9th Cir.1980). DOL must analyze the underlying facts and explain why, reasonably

---

**2.** Although Plaintiffs raised this issue for the first time in their Rule 56.1 Motion, the agency subsequently addressed the issue in the voluntary remand that followed the filing of Plaintiffs' motion. *See* Petition for Trade Adjustment Assistance, AR 2 and Letter from Puckett to Trunzo dated Nov. 13, AR 18–19; *Notice of Negative Determination of Reconsideration On Remand*, 62 Fed.Reg. 31,626. Since DOL had the opportunity to consider the matter and state its reasons for its determination, the Plaintiffs are not estopped from raising this claim before the Court. *See Philipp Brothers, Inc. v. United States*, 10 CIT 76, 78, 630 F.Supp. 1317, 1319 (1986) ("The general rule is that 'administrative exhaustion of remedies is required before a litigant will be allowed to raise a claim via a civil action.'") (citations omitted); *Magnesium Corp. v. United States*, 938 F.Supp. 885, 906 (CIT 1996) ("This

Court would usurp the agency's function if it examined [the agency's] determination upon a ground not presented before [the agency], and for which [the agency] did not have an opportunity to consider the matter and to state the reason for its determination.") Accordingly, the Court can address this issue on the merits.

**3.** Plaintiffs contend that Johnson Controls has demonstrated its ability to transfer battery production from one facility to another. Plaintiffs' Brief at 6. They refer to the UAW president's description of the recent history of domestic plant closings and claim that part of the battery production was transferred to Johnson Controls' plant in Torreon, Mexico. *Id.* (citing Letter from Puckett to Trunzo dated Nov. 13, AR 18).

based upon those facts, it would not include another facility within what the agency determines to be the "appropriate subdivision". If it does so, under the required standard of deference to the Secretary's finding, the Court must uphold DOL's decision as supported by substantial evidence. *See id.* (citing 19 U.S.C. § 2322(b) (Secretary's findings shall be conclusive if supported by substantial evidence)).

▮ In its remand decision, DOL did provide an explanation for treating the workers from the Louisville plant differently than the workers from the Garland, Bennington and Owosso plants. *See Notice of Negative Determination of Reconsideration On Remand,* 62 Fed.Reg. 31,626. According to DOL, the plants had different customer bases because the Louisville plant produced original equipment automotive batteries while the other plants produced aftermarket batteries. *Id.* DOL's explanation constitutes the reasoned analysis required under *Lloyd.*[4] There was substantial evidence in the record to support this conclusion.

## B

**The Technique Used By DOL To Determine Whether Increased Imports Contributed Importantly To The Separation Of Workers Was Not So Marred That DOL's Findings Were Arbitrary Or Of Such A Nature That It Could Not Be Based On Substantial Evidence**

▮ Plaintiffs argue that DOL's industry analysis is incomplete and conducted in an arbitrary manner. Plaintiffs' Brief at 11. Plaintiffs claim that DOL's reliance on its Office of Trade Adjustment Assistance market segment analysis to measure the value of imports from 1991 to 1995 is flawed for two reasons. *Id.* at 9. First, they say the analysis does not provide any data or the requisite comparison with domestic automobile battery production for the same time period. *See Id.* at 9–10. Plaintiffs concede that the absolute values for both imports and domestic production may have declined during that time period; however, they contend that the relative market share of imports may have increased. *Id.* at 9. Second, according to Plaintiffs, DOL gave a "patently misleading" appearance of declining imports by adding together, without explanation, the increase in the value of small battery[5] imports and the substantial decrease in the value of large battery[6] imports. *See id.* at 10–11 and Plaintiffs' Exhibits 4 and 4A. Plaintiffs argue that instead of combining the value of all United States imports of automotive batteries to determine the value of imports during the relevant time period DOL should have examined imports of small batteries separately from imports of large batteries. Plaintiffs' Brief at 10. Plaintiffs contend that DOL should have analyzed the impact of the increase in small battery imports on the sales of batteries from the Louisville plant.[7] *See id.* at 10–11 and Plaintiffs' Reply at 2.

In addition, Plaintiffs question the factual basis for DOL's conclusion that import competition did not play a part in the closure of the Louisville plant because two customers' plants, one allegedly Louisville's second largest customer, did not submit responses to DOL's customer survey. *See* Plaintiffs' Brief at 12 and Plaintiffs' Reply at 1. Plaintiffs claim they are entitled to an explanation "why the [customer] responses are missing

4. In *Pemberton v. Marshall,* 639 F.2d 798, 801 (D.C.Cir.1981), the court held that "[t]he only relevant concern in determining whether a facility is part of the appropriate subdivision is whether it also produces the articles in question." Since DOL's explanation is based upon an analysis of this factor, it is also in accord with the analysis required by law.

5. Lead-acid batteries under 6 kilograms.

6. Lead-acid batteries over 6 kilograms.

7. According to Plaintiffs, the data indicates a significant increase in the import of small batter-

ies up to and including the base period. Plaintiffs' Brief at 11. For example, the value of these imports increased 78% from 1991 to 1994. *Id.* At oral argument, Plaintiffs conceded that the import statistics relied upon in their brief on batteries weighing less than six kilograms are not in the record. Since review is confined to the administrative record, the Court will not consider the claim that such data exists or any arguments solely arising from it. *See* 19 U.S.C. § 2395 (1994); *Woodrum v. Donovan,* 4 CIT 46, 54, 544 F.Supp. 202, 208 (1982).

or why they allegedly can't be used." Plaintiffs' Brief at 12.

Under DOL's regulations, "increased imports" means that "imports have increased either absolutely or relative to domestic production compared to a representative base period." 29 C.F.R. 90.2 (1995). "In determining whether increased imports contributed importantly to the separation of the workers, [DOL] often employs a 'dual test' which looks to whether the subject company's customers reduced purchases from that company and at the same time increased purchases of competitive imports." *United Steelworkers v. United States Secretary of Labor*, 17 CIT 1188, 1190 (1993). While this test "is not ... very sophisticated," this court has found it "a reasonable means of ascertaining a causal link between imports and separations." *Id.* (quoting *United Glass and Ceramic Workers v. Marshall*, 584 F.2d 398, 405–06 (D.C.Cir.1978)). The casual link needed is "a direct and substantial relationship between increased imports and a decline in sales and production." *Id.* (quoting *Estate of Finkel v. Donovan*, 9 CIT 374, 382, 614 F.Supp. 1245, 1251 (1985) (citation omitted)).

Here, DOL mailed survey questionnaires to the companies Johnson Controls identified as its major declining customers. *See* Page of Johnson Controls Completed DOL Business Confidential Data Request Listing Major Declining Customers, CAR 12 and Fax Transmittal Sheets and Cover Letters from Poole to Johnson Controls Major Declining Customers and Fax Transmission Report, CAR 109–120.[8] These companies were Customer 1, Customer 2, Customer 3, Customer 4, and Customer 5. *See* Page of Johnson Controls Completed DOL Business Confidential Data Request Listing Major Declining Customers, CAR 12. DOL only received response from three companies: Customers 1, 2 and 5. *See* Completed Surveys, CAR 123–31. Johnson Controls rather than Customer 4 responded to that company's questionnaire. *See* Johnson Controls Response, CAR 121–22. As a result, DOL excluded Customer 4's information from its analysis. *See* Handwritten Notes, CAR 132. The record does not contain a response from Customer 3.[9] Therefore, DOL only considered data on three of the five Louisville plant customers.[10]

Based on the definition of "increased imports", the key information to establish the causal link necessary is the increase or decrease in customer purchases of imports in comparison to purchases from the Louisville plant. The other general statistical information on automotive battery imports that DOL cites would not prove that imports were the direct and substantial cause of the closure of the plant. Therefore, the missing information on domestic automobile battery production and lack of differentiation between small and large battery imports in the general statistical information is irrelevant. However, deficiencies in gathering information from the customer surveys are relevant and critical to determining if a causal link existed.

Here, DOL failed to gather information from two of the five customers that were sent surveys, including Customer 4, the plant's second largest customer from January through September 1995.[11] *See* Com-

8. Note that the facsimile transmission report confirms that all but the Customer 1 survey were sent out. However, since a response was received from Customer 1, the Court infers that the survey was sent. *See* Fax Transmission Report, CAR 119–20; Completed Survey, CAR 131.

9. In oral argument, Defendant's counsel explained that DOL did not use the information supplied by Johnson Controls for Customer 4 because it did not have the same "assumption of veracity" as information coming directly from the company.

10. Customer 2 reported no purchases from foreign firms and an increase in purchases from Johnson Controls and other domestic firms from 1993 to 1994 and from January to September 1994 to January to September 1995. Completed Survey, CAR 129. Customer 5 reported no purchases from foreign or other domestic firms and an increase in purchases from Johnson Controls from 1993 to January through September 1995. Completed Survey, CAR 125. Customer 1 reported no change in the amount of purchases from Johnson Controls, other domestic firms and foreign firms between 1993 and 1994 and from January through September 1994 to the same period in 1995. Completed Survey, CAR 131.

11. This time period is the most recent period relevant to the investigation. *See* Johnson Controls Completed Supplemental Questionnaire, SCAR 5.

pleted Survey, CAR 121–22; Handwritten Notes, CAR 132; Johnson Controls Completed Supplemental Questionnaire, SCAR 5. This deficiency, however, is not sufficient to find the customer survey technique was arbitrary or not based upon substantial evidence.

Although DOL has not articulated its use of the "dual test" to determine if imports contributed importantly to the separation of Louisville workers, the technique DOL applied of mailing questionnaires to Louisville customers to determine if their purchases of imports increased relative to purchases of Louisville batteries clearly is the "dual test." *See United Steelworkers v. United States Secretary of Labor,* 17 CIT at 1190.

Whether the results of the dual test constitute sufficient evidence for the denial of eligibility for trade adjustment assistance depends on the level of sales or sales decline accounted for in the record. *See Local 167 v. Marshall,* 643 F.2d 26, 31 (1st Cir.1981) (survey accounted for 49% and 68% of sales during relevant period); *United Glass and Ceramic Workers of North America v. Marshall,* 584 F.2d 398, 403 (D.C.Cir.1978) (survey accounted for 21.5% and 38.3% of sales during relevant period); *Stipe v. United States Dep't of Labor,* 9 CIT 543, 544 (1985) (survey accounted for 94.9% and 82.4% of sales decline during relevant period); *Estate of Finkel v. Donovan,* 9 CIT 374, 381, 614 F.Supp. 1245, 1250–51 (1985) (customers responding to survey accounted for "substantial percentage" of lost sales during relevant period); *Retail Clerks Int'l Union v. Donovan,* 10 CIT 308, 312 (1986) (surveyed customer accounted for nearly all sales decline).

Although this court has not established a specific level of sales, or sales decline, for which an account must be made in the rec-

ord, it has found particular samplings insufficient. *See Kelley v. Secretary, United States Dep't of Labor,* 10 CIT 250, 252, 633 F.Supp. 1374, 1376 (1986), *vacated on other grounds,* 812 F.2d 1378 (Fed.Cir.1987) (samplings accounting for only 3% of company's net sales decline were insufficient support for denial of trade adjustment assistance); *Smith v. Brock,* 12 CIT 1009, 1013, 698 F.Supp. 938, 941 (1988) (customers responding represented only 30% of total loss in sales and record lacked information from two firms with greatest decline in purchases).

Here, the percentage of customers that responded to the survey was sufficient for the 1995 period. Based upon percentages provided by Johnson Controls, the customers that responded to the survey represented 54.6% of the plant's customer base during January through September 1995. *See* Defendant's Response To The Court's Order of June 25, 1998.[12] This percentage is well within the percentages this court has found sufficient on other occasions. Therefore, the customer surveys considered by DOL were sufficient for the most recent period, 1995.

As for the other relevant time periods, 1993 and 1994, the record does not contain information of what percentage of sales the customer responses represented. This deficiency is not fatal, however, because gathering data from Customers 3 and 4 would not have made a difference. Even if the data from those customers would have shown they increased their imports and decreased their purchases from Johnson Controls, such a decrease in the plant's sales had no effect because the plant's sales, production and employment increased from fiscal year 1993 to 1994. *See* Johnson Controls Completed DOL Business Confidential Data Request, CAR 8.

---

**12.** On June 25, 1998, the Court ordered Defendant to file a supplemental brief addressing "what percentage of the [Louisville plant's] sales are represented by the customer responses received by [DOL]." On June 30, 1998, Defendant responded that based upon information in the record "customer responses received by the Department of Labor [sic] the period January through September 1995 represent 54.6 percent of the plant's customer base." Defendant's Response To The Court's Order Of June 25, 1998. Defendant also conceded that "[t]he administrative record does not contain sufficient informa-

tion from which to extract the percentages requested for [the other relevant time periods,] fiscal years 1993 and 1994." Plaintiffs declined an opportunity to respond. The Court will rely upon Defendant's calculations because they are derived from information in the administrative record. *See Verson v. United States,* Slip Op. 98–30 at 10–11, 1998 WL 200278, at \*4 (CIT 1998) ("It is axiomatic that, absent surprise or legitimate evidentiary objections, counsel may use properly admitted evidence in any illustrative manner so long as it is relevant.").

Therefore, even if Customers 3 and 4 had increased their imports, those lost sales must have been compensated for by increased sales to other plant customers. As a result, the survey responses were sufficient. The technique used here was not so marred that DOL's findings were arbitrary or of such a nature that it could not be based on substantial evidence.

## C

### DOL Adequately Investigated Plaintiffs' Claims

Plaintiffs contend that DOL placed unwarranted reliance on responses from Johnson Controls about its plans for battery production in this country and Mexico. Plaintiffs' Brief at 11 and 14. Plaintiffs argue that DOL failed to properly investigate the sourcing of Johnson Controls' battery production and the significance of its Mexican operations. *Id.* at 11.

Although Plaintiffs do not dispute that some of Louisville's production was transferred to the Toledo plant, they contend that DOL made no independent effort to verify the scale of this transfer or whether it approached the size of the Louisville operation.[13] Plaintiffs' Brief at 12.

Plaintiffs also assert that DOL allegedly failed to investigate the veracity of statements of Johnson Controls' officials that no production was transferred from Louisville to Mexico. *See* Plaintiffs' Brief 14. Plaintiffs "impeachment" evidence consisted of documents showing that (1) battery production at Johnson Controls' Mexican facility had increased for original equipment and aftermarket customers; (2) volunteers from the Louisville plant were sought to train workers in Mexico; (3) equipment from other Johnson Control plants had been transferred to Mexico; and (4) Johnson Controls had planned to open a distribution center in San Antonio to distribute batteries produced in Mexico.[14] *See* Plaintiffs' Brief 12–14.

In addition, Plaintiffs assert that Johnson Controls officials had allegedly been less than forthcoming about their Mexican operations and that accordingly DOL should have presumed that they were not truthful with respect to this transfer of production.[15] *See* Plaintiffs' Brief at 15.

Here, Johnson Controls' statement that "[n]o production was shifted to Mexico" from Louisville is not contradicted by Plaintiffs' evidence that battery production at the John-

---

**13.** Two hundred sixty four workers were separated from the Louisville plant. *See* Adjustment Assistance Investigation Log, AR 1.

**14.** Plaintiffs also raise a statement made by Mike Johnston of Johnson Controls during a meeting with UAW that "batteries could return to the United States in vehicles or to the 'fill and form' operation in Texas." Plaintiffs' Brief at 13. *See also* Letter from Puckett to Trunzo dated Nov. 13, 1995, AR 18. It was appropriate for DOL to decline to investigate Plaintiffs' apparent allegations that batteries had been transferred from Louisville to Mexico and returned to the United States in new cars because batteries in new cars only indirectly compete with original equipment automotive batteries. Here, the necessary comparison is between "like or directly competitive" automotive batteries (*i.e.*, purchases of foreign manufactured original equipment batteries and the Louisville plant's production of such batteries). *Negative Determination on Reconsideration*, 61 Fed.Reg. at 6658; *see* 19 U.S.C. § 2272(a)(3) (1994); *see also Former Employees of Johnson Controls, Inc. v. United States*, 16 CIT 617, 618 (1992) (increases in imports of finished cars would not provide basis for trade adjustment assistance for workers who produced metal back

and seat frame prototypes for automotive seating).

**15.** Unverified statements from company officials in a position to know about their company's products and business decisions can be relied upon when there is no other evidence in the record to contradict or cast doubt upon those statements. *See Local 167 v. Marshall*, 643 F.2d 26, 31–32 (1st Cir.1981) (Secretary did not abuse discretion by relying on unverified statements of company officials); *United Steel Workers of America, Local 1082 v. McLaughlin*, 15 CIT 121, 122–23 (1991) (Secretary could rely upon unverified evidence from manger who knew what was being produced at plant during period of investigation because statement was not contradicted by the record); *Former Employees of Bell Helicopter Textron v. United States*, 18 CIT 323, 326 (1994) (Unverified statements of company official's could not be relied upon because both officials that were interviewed "had serious adverse interests to acknowledging or confirming that the job loses were due to the fact that [the firm] could pay Canadians less than Americans ... [and] ... intended to do just that. The public relations implications alone were enough to cast a cloak of suspicion over [the] responses.")

son Controls' Mexican facility had increased for original equipment customers. *See* Johnson Controls Completed Supplemental Questionnaire, SCAR 5; Two Paragraphs from *After Market Business* dated Oct. 1, 1994, AR 33. The original equipment production might have been shifted to Mexico from a facility other than Louisville or resulted from new customer orders or increased efficiency.

Contrary to the allegations above discussed, the remaining evidence does not contradict statements made by Johnson Controls' officials. First, Plaintiffs' evidence that aftermarket production had increased at the Mexican plant, management requested volunteers to train Mexican workers, and equipment was transferred to Mexico, is in accord with, rather than in contradiction to, the statement by a company official that the Mexican facility was producing aftermarket batteries.[16] Johnson Controls Completed Supplemental Questionnaire, SCAR 5. In addition, such evidence only suggests that Johnson Controls had transferred some of its automotive battery production to Mexico. It does not establish that the transfer of production was from Louisville as opposed to the three other plants that were previously producing aftermarket batteries.

Second, Plaintiffs' evidence that the company planned to open a distribution center in San Antonio is also in accord with, rather than in contradiction to, company statements that such a facility existed and was in use. *See* Johnson Controls Completed Supplemental Questionnaire, SCAR 5.

Finally, although Plaintiffs' contend Johnson Controls' officials have a propensity to lie, there is no evidence in the record to suggest such a general propensity.[17] "As a general matter, evidence of a person's character or character trait is not admissible in a civil ... case to prove that the person acted in conformity with that character or character trait." 2 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 404.10 (2d ed.1998). Therefore, the evidence in the record does not contradict or cast doubt upon the unverified statements of the Johnson Controls' officials, and DOL did not abuse its discretion by relying on the statements.

## V

## CONCLUSION

For the reasons set forth above, DOL's denial of certification is supported by substantial evidence and is in accordance with the trade adjustment assistance provisions of the Trade Act. Therefore, Plaintiffs' Motion for Judgment on the Agency Record is denied and DOL's *Negative Determination of Reconsideration On Remand* is affirmed.

## JUDGMENT ORDER

This case having come before the Court for decision, and the Court, after due deliberation, having rendered a decision herein; now, in conformity with said decision, it is hereby

ORDERED, ADJUDGED and DECREED that Plaintiffs' Motion for Judgment on the Agency Record is denied; and it is further

ORDERED, ADJUDGED and DECREED that Defendant's Notice of Negative Determination of Reconsideration On Remand is affirmed; and it is further

ORDERED, ADJUDGED and DECREED that all parties shall review the Opinion and notify the Court on or before

16. This information was consistent with DOL's finding that the previously-certified workers from Johnson Controls' other facilities were engaged in the production of aftermarket batteries. *See Notice of Negative Determination of Reconsideration On Remand*, 62 Fed.Reg. at 31,626.

17. Contrary to Plaintiffs' arguments, there is no misstatement of fact about where the Louisville production was transferred domestically. In one response, the company informed DOL that the production had been transferred to Toledo, Ohio.

Page of Johnson Controls Completed DOL Business Confidential Data Request Listing Major Declining Customers, CAR 12. In its second response, the company informed DOL that the "[p]roduction of automotive batteries sold to Gonher de Mexico from Louisville were transferred to Johnson Controls' St. Joseph, Missouri facility." Johnson Controls Completed Supplemental Questionnaire, SCAR 5. However, these statements were made approximately a year and a half apart and by different company officials.

August 10, 1998 whether any information contained in the Opinion is confidential, identify any such information, and request its deletion from the public version of the Opinion to be issued thereafter. If a party determines that no information needs to be deleted, that party shall so notify the court on or before August 10, 1998.